# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| DAVID CLAYBROOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Case No. 3:25-cv-00633** |
| FREIGHTLINER OF ARIZONA, LLC, | ) | **Judge Aleta A. Trauger** |
| ANTHONY BLEVINS, and JAPHETH | ) | |
| DOE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

This case concerns plaintiff David Claybrook's brief employment with defendant Freightliner of Arizona, LLC, doing business as Velocity Truck Centers ("Freightliner").[1] Claybrook has filed suit against Freightliner, his former supervisor, Anthony Blevins, and his former coworker, Japheth Riddle (named in the operative complaint as "Japheth Doe").[2] The operative Second Amended Complaint ("SAC") (Doc. No. 12) brings eight "counts" under state and federal statutes and Tennessee common law, including for sexual assault and battery and claims involving sexual harassment. The three defendants, each represented by separate counsel, have filed four motions now pending before the court. Freightliner argues that Claybrook agreed

---

[1] As the court will describe, the plaintiff's former employer is part of a complex business structure, and the parties use different names to describe the defendant-employer. The plaintiff refers to his former employer as "Velocity." (*See, e.g.*, Doc. No. 12 at 1.) His former employer refers to itself as "Defendant FAZ." (*See, e.g.*, Doc. No. 22 at 1.) The court will use "Freightliner."

[2] On April 1, 2026, the court denied without prejudice Riddle's Motion to Amend Case Caption (Doc. No. 54), for failure to comply with Local Rule 7.01(a). (Doc. No. 57.) Local Rule 7.01(a) requires counsel for the movant to confer with other counsel before filing all but certain motions. L.R. 7.01(a)(1). Riddle has not filed a renewed motion. So he remains as "Doe" in the case caption, but the court will refer to him herein as Riddle.

to arbitrate all claims arising out of his employment and has moved the court, under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, to stay this case and compel arbitration. Freightliner has also filed a Partial Motion to Dismiss. The two individual defendants, meanwhile, indicate that they might also move to compel arbitration, although they have not, and each has moved to dismiss (Blevins) or partially dismiss (Riddle) the SAC.

Claybrook opposes Freightliner's Motion to Compel Arbitration. He argues that (1) no valid agreement to arbitrate exists; (2) because the FAA does not apply to employment contracts of transportation workers, like him, Freightliner cannot move to compel under the FAA; (3) Freightliner has waived the right to arbitrate by participating in litigation; and (4) because the SAC contains allegations of sexual assault or sexual harassment, under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"), Pub. L. No. 117-90, 136 Stat. 26, *codified at* 9 U.S.C. §§ 401–02, he cannot be forced to arbitrate any claims in this case. Freightliner responds that a valid arbitration agreement exists, Claybrook is not a transportation worker, it has not waived its right to arbitrate, and, because Claybrook has not plausibly pled sexual harassment or sexual assault against it, the EFAA does not prevent the court from compelling arbitration.

For the reasons set forth herein, the court will grant in part and deny in part Freightliner's Partial Motion to Dismiss, deny Freightliner's Motion to Compel Arbitration, grant Riddle's Partial Motion to Dismiss, and grant Blevins' Motion to Dismiss.

## I.  PROCEDURAL HISTORY

Plaintiff David Claybrook originally filed this action in June 2025, naming Freightliner as the only defendant. (Compl., Doc. No. 1 at 1.) The Complaint brought two claims under 42 U.S.C § 1981: Race Discrimination and Hostile Work Environment (Count I, Compl. ¶¶ 46–51) and Retaliation and Constructive Discharge (Count II, Compl. ¶¶ 52–63); a claim for negligent

2

supervision and retention (Count III, Compl. ¶¶ 64–71); and a claim for discrimination under the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101 *et seq.* (Count IV, Compl. ¶¶ 72–79).

Claybrook filed an Amended Complaint in July 2025. (Am. Comp. ("FAC"), Doc. No. 7.) The FAC named Anthony Blevins (his former supervisor) and Japheth Doe (his former coworker) (the "individual defendants") as additional defendants. (*Id.* at 1.) The FAC also added a claim of sexual assault and battery against all three defendants (Count V, FAC ¶¶ 80–89); a claim under 42 U.S.C. § 1985(3), for conspiracy to interfere with civil rights, against the individual defendants (Count VI, FAC ¶¶ 90–100); and a claim for intentional infliction of emotional distress ("IIED") against all three defendants (Count VII, FAC ¶¶ 101–108). In addition, the plaintiff states, in the FAC's "Jury Demand" section, that, because some of the claims relate to sexual assault and sexual harassment, no claims are subject to arbitration under the EFAA. (*See* FAC at 16–17 ("[A]ll of Plaintiff's claims must proceed in this Court.").)

In August 2025, the court granted the plaintiff's Unopposed Motion for Leave to File Second Amended Complaint (Doc. No. 9). (Doc. No. 11.) The SAC adds claims against Freightliner for discrimination, retaliation, hostile work environment, and constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) ("Title VII"). (Count VIII, SAC ¶¶ 109–121.)[3]

---

[3] Claybrook alleges that he filed "a timely EEOC charge . . . alleging Racial and Sexual Discrimination, Retaliation, Constructive Discharge and Hostile Work Environment" and that he "expects to receive the notices of his right to sue from the EEOC." (SAC ¶ 3.) In the Motion for Leave that accompanied the then-proposed, now-docketed and operative SAC, however, the plaintiff implies that he had recently received a notice and that is the reason for amending the complaint. (Doc. No. 9 at 1 ("Plaintiff seeks to amend the Complaint . . . [to add] causes of action under Title VII . . . . Plaintiff did not previously have the Notice of Right to Sue from the EEOC.").) The plaintiff does not discuss the notice in his accompanying Memorandum or explain the apparent

3

Now before the court are four motions filed separately by the three defendants. *First*, Freightliner has filed a Partial Motion to Dismiss (Doc. No. 22), in support of which it has filed a Memorandum in Support (Doc. No. 23), to which the plaintiff has filed a Response (Doc. No. 26), and in further support of which Freightliner has filed a Reply (Doc. No. 31). Freightliner seeks to dismiss the plaintiff's "sexual harassment claims against [it] embedded in Counts IV and VIII of [the SAC], as well as the sexual assault claim against [it] in Count V of the [SAC]." (Doc. No. 22 at 1.) Count IV alleges violations of the THRA; Count V alleges sexual assault and battery; Count VIII alleges violations of Title VII.

*Second*, Freightliner has filed a Motion to Compel Arbitration and Stay Judicial Proceedings (Doc. No. 36) under the FAA, in support of which it has filed a Memorandum (Doc. No. 37) and the Declarations of its Director of Human Resources (Montano Decl., Doc. No. 37-1) and General Counsel (Flannery Decl., Doc. No. 37-2), to which the plaintiff has filed a Response (Doc. No. 45), and in further support of which Freightliner has filed a Reply (Doc. No. 52). In addition, both individual defendants have filed short "Responses" stating that they might also move to compel arbitration, once the court has resolved the pending motions to dismiss. (*See* Doc. No. 40 at 1–2 (noting that Blevins "does not oppose [Freightliner's] Motion"); Doc. No. 41 at 1–

---

discrepancy between the Motion and the SAC. (*See* Doc. No. 9-1.) The plaintiff has thus not made clear whether he has received a notice of right to sue.

Before filing suit in federal court, a Title VII plaintiff must first exhaust his administrative remedies by filing a charge of discrimination with the EEOC and receiving a right-to-sue letter. *Alexander v. Univ. of Memphis*, No. 20-5426, 2021 WL 2579973, at *3 (6th Cir. June 7, 2021) (citing *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018)). The exhaustion requirement, while not jurisdictional, is a mandatory "claim-processing rule" that must be enforced *if* properly raised by the employer. *Id.* (citations omitted). Thus, "[i]t is well-settled that failure to timely exhaust administrative remedies is an appropriate basis for dismissal of a Title VII action." *Thetford v. Bradford Special Sch. Dist.*, No. 24-cv-01020-STA-JAY, 2025 WL 1348936, at *3 (W.D. Tenn. May 8, 2025) (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)). However, Freightliner has not raised exhaustion as a defense, and the court will not raise it *sua sponte*.

4

2 ("Riddle reserves the right to seek application of the Arbitration Agreement to any remaining claims against him that are not otherwise dismissed by the Court").)

*Third*, Riddle has filed a Partial Motion to Dismiss (Doc. No. 42), in support of which he has filed a Memorandum (Doc. No. 43), to which the plaintiff has filed a Response (Doc. No. 46), and in further support of which Riddle has filed a Reply (Doc. No. 50). Specifically, Riddle moves to dismiss the SAC's claims against him for both conspiracy to interfere with civil rights, under 42 U.S.C. § 1985(3) (Count VI, SAC ¶¶ 90–100), and IIED (Count VII, SAC ¶¶ 101–08). (Doc. No. 42 at 1.)[4]

*Fourth*, Blevins has filed a Motion to Dismiss (Doc. No. 44), in support of which he has filed a Memorandum (Doc. No. 44-1), to which the plaintiff has filed a Response (Doc. No. 47), and in further support of which Blevins has filed a Reply (Doc. No. 51). Blevins seeks dismissal of all of the claims against him for failure to state a claim. (Doc. No. 44 at 1.)

## II.     LEGAL STANDARDS

### A.      Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020) (quoting Fed. R. Civ. P. 12(b)(6)). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient

---

[4] Riddle makes two additional "requests" in his Motion, which are made without explanation in his Motion and without discussion in his briefs. First, Riddle "requests . . . an award of Riddle's attorney's fees." Riddle's request for attorney's fees will be denied without prejudice; he may move for attorney's fees in accordance with Local Rule 54.01. Second, Riddle "requests . . . that the dismissal be certified as a final order under Fed. R. Civ. P. 54." (Doc. No. 42 at 2.) This request will also be denied.

to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 754 (6th Cir. 2023) (quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)).

### B. Motion to Compel Arbitration

The FAA "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). It provides that any agreement to arbitrate falling under the statute "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, "courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019). To that end, the FAA provides for "orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 416 (6th Cir. 2011) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). FAA Section 3 requires courts to "stay the trial of" any suit "brought . . . upon any issue referable to arbitration under an agreement . . . until such arbitration has been had." 9 U.S.C. § 3. Section 4 allows parties "aggrieved by" another's "failure . . . or refusal . . . to arbitrate" under an arbitration agreement to petition a court "for an order directing that such arbitration proceed." *Id.* § 4.

6

To compel arbitration under the FAA, a court must find that "(1) the parties agreed to arbitrate; (2) the claims asserted fall within the scope of the arbitration agreement; and (3) Congress did not intend for those claims to be non-arbitrable." *Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 375 (6th Cir. 2026) (quoting *Memmer v. United Wholesale Mortg., LLC*, 135 F.4th 398, 404 (6th Cir. 2025)), *pet. for r'hearing en banc denied*, No. 25-5210 (Apr. 9, 2026), ECF No. 28-1. "Rule 56's standards govern whether a court should hold a trial under § 4 when a party alleges that no contract exists." *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 838 (6th Cir. 2021) (citations omitted). *See also Bazemore v. Papa John's U.S.A., Inc.*, 74 F.4th 795, 798 (6th Cir. 2023) ("If a genuine issue of material fact arises as to whether such an agreement exists, the court 'shall proceed summarily to the trial thereof.'" (first citing *Boykin*, 4 F.4th at 837; and then quoting 9 U.S.C. § 4)).

## III. FACTS

### A. Claybrook's Employment[5]

#### 1. *The Plaintiff's Job*

Claybrook alleges that he is a "qualified CDL driver" whom Freightliner hired to "be a class A driver to transport various trucks that were repaired by [Freightliner]."[6] (SAC ¶¶ *13–

---

[5] For purposes of the pending motions brought under Rule 12(b)(6), the court accepts the SAC's well-pleaded facts as true and draws "all reasonable inferences" in the plaintiff's favor. *Romero v. City of Lansing*, 159 F.4th 1002, 1006 (6th Cir. 2025) (citing *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019)).

[6] Class A commercial driver license holders may operate vehicles that tow trailers of over 10,000 pounds and, with the trailer, have a combined weight of over 26,000 pounds. Tenn. Dep't of Homeland Security, "Commercial Driver License," https://www.tn.gov/safety/driver-services/commercial-driver-license.html (last visited Apr. 7, 2026) [https://perma.cc/TEH8-PLAM].

7

*14.)[7] He began work on January 14, 2025 at Freightliner's Nashville "truck center" and resigned ten days later, on January 24, 2025. (SAC ¶¶ 7, 38.)[8] The plaintiff describes his workplace both as a "truck center" and a "body shop." (*Id.* ¶¶ 13, 17.) Claybrook does not otherwise explain his work or Freightliner's business, although he alleges that, "after years of working long weeks over the road," he "thought he had finally found a great position that would allow him to return home to his family each night." (*Id.* ¶ *13.) Nor does Claybrook clarify the nature of his work in his briefs, except to say that he was "employed as a Driver for [Freightliner's] vehicle logistics operation, directly involved in the interstate transport and delivery of commercial vehicles and parts." (Doc. No. 45 at 1.) The plaintiff does not explain what "vehicle logistics operation" means or how he was involved in the interstate transportation or delivery of commercial vehicles or parts. Based on the limited information the plaintiff has proffered, the court infers that Claybrook's job was to drive large, commercial vehicles in and around the Nashville shop in which they were repaired, and possibly that he returned the vehicles to their owners or operators, who were sufficiently close to Nashville to allow Claybrook to make same-day round trips, which may or may not have included trips to neighboring states.[9]

---

[7] The SAC duplicates several paragraph numbers. There are two each of paragraphs 13–14, 46–49, 52, and 72. The court will refer to the second such paragraphs with an asterisk. *E.g.*, "SAC ¶ *13."

[8] The plaintiff does not clarify in the SAC whether the day he submitted his resignation was also his last day of work, but the briefing makes clear that it was. For example, Freightliner writes, in its Memorandum in support of its Partial Motion to Dismiss, that Claybrook "worked as a truck driver for nine days from January 14, 2025 until his voluntary resignation on January 24, 2025." (Doc. No. 23 at 1.) In his Response, Claybrook does not contest Freightliner's characterization of the length of his employment and notes that he "resigned after only ten (10) days." (Doc. No. 26 at 8; *see also* Doc. No. 47 at 2 (describing the harassment as so severe that Claybrook was "forc[ed] . . . to resign after only nine days").)

[9] The court observes that one could easily make a round trip from Nashville to a neighboring state during an eight-hour workday. Freightliner states, without citation, that

8

Freightliner's declarants shed some light on its business and business structure, which the court can consider when deciding the Motion to Compel, to which the court applies a summary judgment standard. One of Freightliner's declarants, Matthew Flannery, is General Counsel of Velocity Vehicle Group LLC ("VVG"), which is a parent company four entities removed from Freightliner. (Flannery Decl. ¶¶ 2, 4–7.) Flannery explains that VVG "sells new and used commercial vehicles, leases and rents commercial vehicles, and provides parts and services including maintenance, repair, and body work." (*Id.* ¶ 2.) VVG "has two subsidiary holding companies," the second of which owns another company, which owns the defendant. Freightliner "employs the body shop and service employees for the operating dealership locations." (*Id.* ¶¶ 4–8.) Freightliner's other declarant, Isamar Montano, is VVG's Director of Human Resources, and in that capacity provides "human resources related support for dealerships associated with" Freightliner and is therefore "equally familiar with the HR operations for persons employed by the Defendant." (Montano Decl. ¶¶ 3–4.) He states that Freightliner "purchases and utilizes goods and services from throughout the United States to conduct its business, and it sells goods and services in interstate commerce." (*Id.* ¶ 5.) And he states that Claybrook "worked for Freightliner . . . as a Driver at the body shop in Nashville, TN." (*Id.* ¶ 7.)

### 2. *The Arbitration Agreement*

Freightliner has moved to compel arbitration under the FAA. Freightliner has filed Claybrook's Offer Letter (Doc. No. 37-1 at 8) and what its declarant states is the operative Arbitration Agreement ("Agreement") (Doc. No. 37-1 at 10–18).[10] (Isamar Decl. ¶¶ 9, 14.) The

---

"Plaintiff's limited driving during his . . . employment was only local in the Nashville area, and Plaintiff knows that." (Doc. No. 52 at 3.)

[10] The court will refer to the Agreement's own pagination, rather than that assigned by the court's electronic filing system.

plaintiff argues that he did not contract with Freightliner. Claybrook's one-page Offer Letter is on "Velocity Vehicle Group" letterhead and signed by Blevins. (Doc. No. 37-1 at 8.) It states that "Freightliner of Arizona LLC Velocity Vehicle group [sic] (VVG) is pleased to offer you the position of Driver, Body Shop USA, at our Nashville location." (*Id.*) The Letter purports to incorporate by reference a "Dispute Resolution Agreement" (*id.*), which Freightliner sent to Claybrook by separate email (Isamar Decl. ¶ 13) and which is in fact titled "Mutual Arbitration Agreement." (Agreement at 1.)[11] The Agreement provides that:

> both the Company and Team Member agree that any Covered Claims . . . that the Company or the Team Member may have against the other relating to or arising out of the Team Member's employment or the cessation of that employment shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act[.]

(Agreement ¶ I.) Furthermore, while the Agreement states that it will be governed by the FAA, it adds that, "[i]f the FAA does not apply, the state law in the state where the Team Member's primarily assigned work location is located shall apply." (*Id.*) And, "[a]ll other legal decisions shall be determined by the federal, state or local law applicable in the state where the Team Member's primarily assigned work location is located." (*Id.*)

Confusingly, the Agreement names Los Angeles Truck Service, LLC ("LATS"), as the employer, rather than Freightliner, which is nowhere mentioned. However, it also defines "the Company" expansively, in relevant part, to include LATS's "affiliates."

> In this Arbitration Agreement, the term 'the Company' refers to the employer, Los Angeles Truck Service, LLC, and includes its holding companies, parents, franchisors, subsidiaries, divisions, *affiliates*, insurers, predecessors, successors and assigns, their (including the Company's) respective owners, directors, officers, shareholders, managers (both direct and indirect), team members, employees, vendors, contractors, and agents.

---

[11] Freightliner's declarant states that arbitration agreements are "sometimes referred to internally as . . . Dispute Resolution Agreement[s]." (Isamar Decl. ¶ 13.)

(*Id.* (emphasis added).) The parties debate at length whether the plaintiff, who was employed by Freightliner, can be bound to arbitrate claims against it by an Agreement that lists LATS as a party. (*See* Doc. No. 37 at 5–11; Doc. No. 45 at 4–6; Doc. No. 52 at 4.) In essence, Freightliner argues that, because Claybrook indisputably (a) agreed to arbitrate claims against "the Company," (b) "the Company" includes LATS's "affiliates," and (c) Freightliner is a LATS affiliate, it can enforce the Agreement. (Doc. No. 37 at 6 (citing Flannery Decl.).) Flannery, VVG's General Counsel, explains how LATS is Freightliner's affiliate. He states that LATS and Freightliner are "affiliated entities under the common ownership and control of Velocity Vehicle Group LLC." (Flannery Decl. ¶ 9.) Both LATS and Freightliner are "wholly owned subsidiaries" of two other companies, respectively, and those two other companies are wholly owned subsidiaries of the same company, which is a "subsidiary holding company" of another company, which is a subsidiary holding company of VVG. (*Id.* ¶¶ 4–6.)

Claybrook also states that there is "no evidence at all presented that Plaintiff signed the alleged arbitration agreement." (Doc. No. 45 at 5 (adding that his "signature is not legible").) And he states that Freightliners' declarants' statements regarding his signature are "conclusory and lack the digital evidence necessary for authentication under Fed. R. Evid. 901(a)." (*Id.*) Freightliner responds to these arguments as well. (Doc. No. 52 at 4.) In relevant part, Freightliner argues that, while it has presented evidence regarding the validity of the contract, Claybrook has not; nor has Claybrook stated that he did not sign it. (*Id.*) The Agreement bears what appears to be an (illegible) electronic signature, with "David Claybrook" typed above the space for the employee's name. (Agreement at 9.) Freightliner's declarant states that Claybrook electronically signed the Agreement. (Isamar Decl. ¶¶ 13–14.) The Agreement is countersigned by "Amada Alvarez," identified as the "HR Representative" and "Human Resources Chief of Staff." (Agreement at 9.)

11

The Agreement does not state which company or companies Alvarez represents. Isamar states that it was signed by "a company human resources representative." (Isamar Decl. ¶ 14.) For the purpose of the pending Motions, the court presumes, without deciding, that Freightliner and Claybrook are bound by the Agreement.

### 3. The Plaintiff's Alleged Mistreatment

Claybrook "is a black man." (SAC ¶ 17.) On January 14, 2025, Claybrook reported for his first day of work, and for the following nine days was "subjected to a barrage of racist, homophobic, and physically invasive, sexual and racist harassment conduct by coworkers and his supervisor, Anthony Blevins." (*Id.* ¶¶ 15–16.) The "work environment [was] so abusive that he was left with no choice but to resign," which he did, on January 24, after an unnamed party—presumably a coworker—asked him if he "'picked cotton' on the farm he was raised on," which constituted the "final straw." (*Id.* ¶¶ 2, 38.) The plaintiff describes his resignation as a "constructive discharge." (*See, e.g.*, *id.* ¶ 49.) That is, his "resignation was not voluntary." (*Id.* ¶ 40.) Rather, the "racially and sexually hostile work environment [was] so severe and pervasive that a reasonable person in his position would have felt compelled to resign." (*Id.*) The plaintiff describes two instances of alleged sexual harassment and repeated racial harassment during his employment, and the plaintiff further alleges that the racial and sexual harassment were "intertwined." (*Id.* ¶ 47.) Notwithstanding the plaintiff's contention that "this is a paradigmatic sexual harassment case" (Doc. No. 26 at 2), it is not.

### a) Alleged Harassment Based on Sex

### (1) Blevins' Joke

"While riding with his supervisor, Mr. Blevins, during his first day of training, Mr. Blevins told plaintiff to go across the street to a gay bar and get 'footlong wieners' for lunch." (SAC ¶ 22.)

12

Claybrook describes this remark as a "homophobic joke meant to be sexual in nature." (*Id.*)[12] The court will refer to Blevins' remark as the "Joke." Furthermore, the plaintiff describes the Joke as "dehumanizing treatment by . . . his supervisor," which was "designed to ridicule and humiliate Plaintiff on the basis of perceived sexual identity and masculinity," and that, in making the Joke, Blevins "participated in the sexually charged environment." (*Id.* ¶¶ 67, 93.)

### *(2)    The Groping Incident*

On his "first full day [of work], Plaintiff was physically groped by a coworker . . . while Mr. Blevins watched and did nothing." (SAC ¶ 23.) Specifically, an unnamed "male coworker . . . intentionally groped Plaintiff's chest" and in doing so stated "[y]ou feel good" in a "sexualized and humiliating manner." (*Id.* ¶¶ 82–83.) The court will refer the coworker's groping Claybrook and saying it felt good as the "Groping Incident." Claybrook alleges that he did not consent to the

---

[12] While the plaintiff first describes Blevins' comment as a "joke" (SAC ¶ 22), he alternately describes it as an instruction and a suggestion, and in addition alternately describes the comment as that he procure *a* wiener and *multiple* wieners, which, in the latter case, would suggest that Blevins was requesting (or joking about) lunch for them both. (*See id.* ¶ 93 ("Blevins *directed* plaintiff to 'go across the street to the gay bar and get footlong *wieners*[.]'" (emphasis added)); *id.* ¶ 67 ("Blevins *t[old]* Plaintiff to go get *some* footlong *wieners*[.]"); *id.* ¶ 103 ("*suggesting* Plaintiff should go across the street to a gay bar to get *a* 'footlong *wiener*'") (emphasis added).) Claybrook also describes the joke as a directive in briefing. (*See* Doc. No. 26 at 3 ("The directive to eat at the gay bar where they serve 'footlong wieners' from his supervisor[.]").) The court will adopt the language the plaintiff first uses to describe Blevins' comment, and which appears to be the most accurate description based on the pleading—a "joke," rather than a directive. Indeed, there is no allegation that Claybrook obeyed the "directive" from his new boss by procuring lunch. Nor does Claybrook allege that he disobeyed the directive and explain the fallout. And there are no other allegations regarding the bar, including whether it was open during lunch or served food of any sort, which could have supported an inference that Blevins' comment was a directive. Furthermore, the plaintiff contends in briefing that the Joke was not merely "vulgar[]," but that it also "invoked racist and sexualized stereotypes about Black men's anatomy." (Doc. No. 26 at 3.) While the court will not fully explicate Blevins' Joke, the plaintiff does not adequately allege that the Joke implicates race. Even if the court accepts, as the plaintiff presumes in briefing, the existence of certain stereotypes, the plaintiff does not explain how Blevins' Joke, that the plaintiff *procure* footlong wieners from a gay bar not alleged to attract clientele or staff of any particular race, invoked racialized stereotypes.

13

touching and that it was "committed for the purpose of sexual gratification or to exert control over Plaintiff in the workplace." (*Id.* ¶ 84.) The Groping Incident caused Claybrook to "immediately fe[el] violated, humiliated, and unsafe at work." (*Id.* ¶ 25.) The plaintiff described the Groping Incident as "not only a form of sexual assault and battery but also part of the same pattern of racially charged harassment that treated Plaintiff as an object to be mocked and violated because of his race." (*Id.* ¶ 26.) Further, the "physical assault," which his supervisor passively observed, "reinforced the racial and sexualized hostility pervading the workplace." (*Id.*) Although Claybrook reported to Blevins that his coworker's action "made him uncomfortable, Mr. Blevins stated 'oh that's just him, that's how he is' and told Plaintiff to get over it." (*Id.* ¶ 27.) Thereafter, "Blevins began to treat him differently . . . . Mr. Blevins began to speak to Plaintiff in a short, terse manner as though Plaintiff were the problem for simply reporting his opposition." (*Id.* ¶ 28.)

The plaintiff states that the "SAC alleges that: Defendant Doe (Riddle) physically groped Plaintiff in the chest area[.]'" (Doc. No. 46 at 2.) For his part, Riddle writes that, "based upon a liberal reading of the SAC," he "assumes" that the unnamed coworker who groped the plaintiff is meant to be him. (Doc. No. 43 at 2.) Riddle also liberally construes the SAC to allege that he used racial slurs. (*Id.* (citing SAC ¶ 49).) Indeed, the SAC describes the Groping Incident several times, but it never states who groped Claybrook. The court does not need to resolve whether the SAC alleges who groped the plaintiff to decide the pending motions.

### b) Mistreatment Based on Race

Other than the plaintiff, only one other employee at the body shop "identified as a racial minority." (SAC ¶17.) This colleague "tended to work alone with headphones to avoid interacting with other colleagues" because the work environment "had been hostile" during the five years of this other employee's time with Freightliner. (*Id.* ¶¶ 18–19.) Because this colleague worked alone, "[u]pon information and belief," the plaintiff alleges that other staff referred to the employee's

14

workspace as "the minority corner." (*Id.* ¶ 20.) Claybrook "often worked alongside this employee in the 'minority corner.'" (*Id.*) Claybrook was "called 'nigga' and repeatedly witnessed the coworkers using the slur openly while at work." (*Id.* ¶ 29.) He was a "witness to and subjected to racist jokes" and "mocked with Nazi salutes and Holocaust references after failing to guess the name of a coworker." (*Id.* ¶¶ 30–32.) The plaintiff alleges that he was "repeatedly subjected to racially offensive conduct, including being called the 'n-word,' being placed in the 'minority corner,' and being the target of jokes involving police brutality, slavery, and Nazi imagery." (*Id.* ¶ 96.)[13] Claybrook "expressed opposition to the remarks and 'jokes'" to both his supervisor and coworkers, but, because some coworkers carried firearms, and there were no surveillance cameras, Claybrook "believed that if he were to express any more pushback than he had, his personal safety would be at risk." (*Id.* ¶¶ 36–37.)[14]

The plaintiff alleges that the "racial harassment and sexual harassment and assault were intertwined." (SAC ¶ 47.) That is, the "sexual touching, crude sexualized directives from management, and racial slurs were not separate events." (*Id.* ¶ 48.) Rather, "[t]hey operated together to communicate that racial minority employees—isolated to what coworkers called the 'minority corner'—could be physically handled, mocked, and degraded without consequence."

---

[13] The court observes that the plaintiff's characterization of "being *placed* in the 'minority corner'" is the SAC's only allegation that his particular workspace within the body shop was involuntary. (SAC ¶ 96 (emphasis added); *see id.* ¶ 20 ("Plaintiff often worked . . . in the 'minority corner.'"); *id.* ¶ 103 (stating that his coworkers "refer[ed] to his work area as 'the minority corner'").) Absent a more definitive statement that Claybrook was forced to work in a racially segregated area, the court does not infer it, even construing the facts in the light most favorable to the plaintiff. Indeed, the plaintiff alleges that he "often" worked in the "minority corner," which implies that he sometimes sat elsewhere. (*But see id.* ¶ 48 (noting that "racial minority employees [were] isolated to what coworkers called 'the minority corner'").)

[14] The court notes that, other than the Groping Incident, Claybrook does not allege that any coworker touched him or threatened him, and he does not otherwise state the basis of his fear of physical retaliation.

15

(*Id.*) Thus, the "unwanted groping . . . was not only sexual in nature but also racially motivated." (*Id.* ¶ *49.) The groping "furthered the objectification of Plaintiff as a Black man and was part of a continuing course of racial abuse." (*Id,*; *see also id.* ¶ 112 ("The unwanted groping of Plaintiff was both sexual and racially motivated . . . . The conduct furthered the objectification of Plaintiff as a Black man[.]").) Because of the harassment and Freightliner's inaction, Claybrook alleges, he has "experienced anxiety, insomnia, loss of self-worth, and other emotional distress symptoms." (*Id.* ¶ 46.) He has also suffered "mental anguish, loss of income, and reputational harm," along with "humiliation . . . loss of sleep, loss of enjoyment of life, emotional trauma, and psychological harm." (*Id.* ¶¶ 52, 106.)

The last straw for the plaintiff was an unidentified person asking him "if he 'picked cotton' on the farm he was raised on." (*Id.* ¶ 38.) Because Claybrook was "unable to endure further racial or sexual harassment and receiving no protection from management," on January 24, 2025 he resigned. (*Id.*) The plaintiff describes his resignation as "not voluntary;" rather, "[i]t was the result of a racially and sexually hostile work environment so severe and pervasive that a reasonable person in his position would have felt compelled to resign." (*Id.* ¶ 40.) Thus, after ten days, "Plaintiff submitted his resignation, detailing some of the harassment he experienced in a written complaint." (*Id.* ¶ 38; *see also id.* ¶ 54 (stating that Claybrook "submitted a written complaint to Human Resources on or about January 24, 2025").)

Confusingly, Claybrook alleges that, despite "Plaintiff's written complaint," which he submitted with his resignation on his last day of work (*see id.* ¶ 57 ("Plaintiff's resignation included complaints about the hostile workplace environment")), Freightliner "did nothing to engage in a meaningful investigation." (*Id.* ¶ 58.) Instead, in response to his verbal complaint to Blevins and his written complaint to Human Resources, Freightliner "took materially adverse

16

action against Plaintiff by allowing the harassment to continue unchecked and by fostering an environment so hostile and racially abusive that Plaintiff was left with no choice but to resign." (*Id.* ¶ 55.) Furthermore, Claybrook's "resignation was a constructive discharge caused by [Freightliner's] deliberate inaction and retaliatory indifference." (*Id.* ¶ 59.)

        *c)      Claybrook and Freightliner Disagree About What the SAC Alleges*

One of the pending Motions is Freightliner's Partial Motion to Dismiss, which seeks dismissal of the plaintiff's "sexual harassment claims against [Freightliner] embedded in Counts IV and VIII of [the SAC], as well as the sexual assault claim against [it] in Count V of the [SAC]." (Doc. No. 22 at 1.) Count VIII, brought under Title VII, alleges a hostile work environment, among other claims. (SAC at 15.) But the parties disagree about what allegations of sexual harassment giving rise to a hostile work environment the SAC contains, setting aside whether they are plausibly alleged. Freightliner identifies in the SAC only two instances of alleged sexual harassment: the Joke and the Groping Incident, which the court has summarized. Freightliner argues that other statements, like that the plaintiff was subjected to "a barrage" of harassment, is conclusory. (Doc. No. 23 at 3 (citing SAC ¶ 16).) The plaintiff responds that he has "alleged far more than two stray incidents of sexual harassment, discrimination and hostile work environment." (Doc. No. 26 at 1–2.) The plaintiff states that the SAC "gives examples such as being groped on the first day," that Blevins told him to "get over it" and then treated him worse after reporting his concerns, and that the SAC "describes how Defendant Blevins and Defendant Riddle perceived him to be a homosexual and/or effeminate and harassed him on this perceived basis." (*Id.* at 2 (citing SAC ¶ 93).) Furthermore, the plaintiff describes the SAC as alleging that his workplace was a "grossly sexualized hostile environment which included physical assault and constant harassment," in addition to "homophobic remarks targeting him as a man." (*Id.* at 5.) The plaintiff refers to "the use of homophobic slurs." (*Id.* at 7.) Moreover, the plaintiff states that he endured

17

"humiliating sexual directives" and that "Blevins believed Plaintiff to be gay based upon Defendant Blevins' observations of the way Plaintiff dressed and took care of himself and that Defendant Blevins mercilessly mocked him for it." (*Id.* at 5–6.) That is, in addition to the Groping Incident and the Joke, Claybrook was "told by Defendant Blevins he thought he was homosexual" and "subjected [him] to repeated homophobic remarks in an environment that weaponized sexual identity as a means of humiliation." (*Id.* at 6–7.)

The plaintiff is correct that he is "not required to allege every instance of misconduct with heightened specificity." (Doc. No. 26 at 8.) The Sixth Circuit has recently agreed with the plaintiff on this point: "Even at summary judgment, a plaintiff may meet her burden of showing that such conduct was pervasive by asserting that it was 'ongoing,' 'commonplace,' and 'continuing,'—she need not, that is, 'recount' each and every 'specific instance' of such comments." *Bruce*, 168 F.4th at 377 (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (quotation modified)). In *Bruce*, on appeal from this court's denial of a motion to compel arbitration, the plaintiff alleged that her boss "continued sexually harassing" her "when he was in the office" by "making sexual comments and jokes to and about Ms. Bruce, as well as making inappropriate comments about Ms. Bruce's appearance, clothing, and private life." *Bruce*, 168 F.4th at 373. She alleged that the jokes occurred during "work-related conversations" and "in team meetings," giving examples of what her boss would say. *Id.* She alleged that her boss's comments were "persistent, ongoing, and continued up until the day Ms. Bruce was fired." *Id.* at 379. The court inferred from the complaint that her supervisor "consistently and continually directed sexualized comments at her," and that the allegations were "sufficient to allow a plausible inference that [her supervisor's] comments occurred more than a handful of times." *Id.* at 378–79. The court

18

concluded that, because the "well-pleaded facts demonstrate a pattern of humiliating sexualized comments by a supervisor," the plaintiff had plausibly alleged sexual harassment. *Id.* at 380.[15]

In this case, however, the plaintiff's brief both inflates the allegations in the pleading and adds new ones. In sum, the court finds that the SAC does not state, imply, or hint that incidents of sexual harassment occurred more than twice. For example, while the plaintiff alleges that he was "subjected to *repeated* racial slurs, racist comments, sexual assault and battery, and retaliation during his employment with Velocity," he does not clarify what "repeated" modifies—racial slurs only, or "sexual assault and battery" and "retaliation" as well. (SAC ¶ 2 (emphasis added).) The pleading does otherwise not state or imply that Claybrook was subject to more than one touching, and the plaintiff all but explicitly denies that it does. (Doc. No. 26 at 8 (noting that "the totality [of allegations] includes *a* sexual assault chest groping" (emphasis added)); *see also* Doc. No. 46 at 1 ("The SAC alleges that . . . *Riddle*[] physically groped Plaintiff in the chest area, *an* unwanted sexual touching[.]"(emphasis added)).)

Similarly, the plaintiff alleges that he was "subjected to a barrage of racist, homophobic, and physically invasive, sexual and racist harassment conduct by coworkers and his supervisor, Anthony Blevins." (SAC ¶ 16.) But this allegation again lumps together all of the alleged misconduct, and, while it *could* be read to imply that Claybrook was assaulted more than once, the SAC does not otherwise suggest that he was, and, as the court noted above, Claybrook has disavowed that he was. To take another example, the plaintiff alleges "persistent physical and

---

[15] At the district court level, this court found that, while the case presented "an extremely close call," "the three examples of inappropriate comments are apparently intended to be just that: examples," and that the plaintiff alleged that "such comments were essentially continuous for the period of time she was employed." *Bruce v. Adams & Reese, LLP*, No. 3:24-cv-00875, 2025 WL 611071, at *9 (M.D. Tenn. Feb. 25, 2025), *aff'd*, 168 F.4th 367 (6th Cir. 2026).

19

verbal harassment . . . including unwanted groping, offensive sexually charged remarks, racial slurs, and offensive gestures." (SAC ¶ 43.) There again, the plaintiff alleges "persistent" misconduct, but does not specify that "persistent" ranges over the alleged sexual harassment. That is, he does not allege that the Groping Incident, and the one Joke, the two instances he describes, were mere examples of sexual misconduct, as the court inferred in *Bruce*. The pleading refers to "[the] . . . sexualized directive*s* from management" (*id.* ¶ 48), but nowhere specifies what other "directives" there were, other than the Joke—which, in any case, the court construes as a joke, and not a directive. In briefing, the plaintiff again refers to "humiliating sexual directives" (Doc. No. 26 at 2, 5; *see also id.* at 8 ("sexually humiliating directives")), but only describes the Joke. (*Id.* at 3.) And while he *states* that the SAC alleges "repeated homophobic comments from a supervisor," those allegations are simply not in the SAC.

Meanwhile, in his Response brief, the plaintiff states that "Blevins believed Plaintiff to be gay based upon Defendant Blevins' observations of the way Plaintiff dressed and took care of himself and that Defendant Blevins mercilessly mocked him for it." (Doc. No. 26 at 5.) The plaintiff states that the "Complaint provides concrete examples and further alleges that homophobic harassment . . . [was] routine." (*Id.* at 8–9.) In another brief, the plaintiff states that "Blevins asked if Plaintiff were gay, presupposed he was and told him to go eat w[ie]ners across the street at the gay bar." (Doc. No. 46 at 2.) That is, in addition to the Groping Incident and the Joke, Claybrook was "told by Defendant Blevins he thought he was homosexual" and "subjected to repeated homophobic remarks in an environment that weaponized sexual identity as a means of humiliation." (Doc. No. 26 at 6–7.) Claybrook states that the SAC "describes how Defendant Blevins and Defendant Riddle perceived him to be a homosexual and/or effeminate and harassed him on this perceived basis." (*Id.* at 2 (citing SAC ¶ 93).)

20

The problem is that the SAC does not allege that anyone thought Claybrook was gay or effeminate and does not allege any facts about the way he dressed or how anyone perceived how he dressed. The SAC does not mention, let alone allege, "homophobic harassment," other than possibly the Groping Incident and the Joke. The SAC does not allege that anyone used homophobic slurs. The SAC does not allege that "Riddle and other colleagues apparently perceived Plaintiff as a homosexual man or that he did not fit the stereotype of a heterosexual man and harassed him on that basis." (*Id.* at 7.) The SAC certainly does not allege that Blevins told Claybrook he thought he was gay. The SAC does not allege that Riddle thought the plaintiff is gay. Paragraph 93 describes the Joke as a "sexually suggestive comment designed to ridicule and humiliate Plaintiff on the basis of perceived sexual identity and masculinity." (SAC ¶ 93.) That is the pleading's only relevant reference to anyone's perception of the plaintiff.

Even drawing all reasonable inferences in the plaintiff's favor, the court cannot construe the plaintiff as alleging sexual harassment other than the Joke and the Groping Incident, notwithstanding the SAC's use of the plural in some instances. However, as the court has recounted above, the SAC does allege persistent harassment based on race.

## IV. DISCUSSION

### A. Freightliner's Partial Motion to Dismiss

#### 1. Count V

Count V alleges sexual assault and battery against all defendants, including Freightliner.[16] (SAC ¶¶ 80–89.) The claim is premised solely on the Groping Incident. The SAC alleges that "Defendant," presumably Freightliner, "is vicariously liable for the actions of its employee under

---

[16] Claybrook has "voluntarily dismisse[d]" his claim of sexual assault and battery against Blevins. (Doc. No. 47 at 1.)

21

the doctrine of *respondeat superior*, and independently liable for its ratification and failure to prevent or remediate known physical and sexual misconduct in the workplace." (*Id.* ¶ 89.) Freightliner argues that it cannot be vicariously liable for the Groping Incident action because Riddle—presumably the coworker who allegedly groped the plaintiff—was not "acting within the course and scope of his employment when the injury occurred."[17] (Doc. No. 23 at 14 (quoting *Rositano v. Freightwise, LLC*, No. 3:20-cv-00420, 2021 WL 1174589, at *4 (M.D. Tenn. Mar. 26, 2021) (Crenshaw, C.J.)).)

Claybrook appears to waive or abandon any such theory of liability in his Response. Instead, referring to the SAC, Claybrook states that he "alleged not only *respondeat superior*, but also ratification and negligent supervision." (Doc. No. 26 at 9.) Indeed, the SAC alleges that Freightliner is liable for sexual assault and battery "under the doctrine of *respondeat superior*, *and independently liable for its ratification and failure to prevent or remediate known physical and sexual misconduct in the workplace.*" (SAC ¶ 89 (emphasis added).) Confusingly, however, the plaintiff then discusses only the THRA and Title VII (Counts IV, VIII), not sexual assault and battery (Count V). (Doc. No. 26 at 9 ("THRA and Title VII permit employer liability where management participates in, condones or fails to act on known sexual misconduct." (citations omitted)).) And then the plaintiff appears to mix vicarious liability, negligent supervision, sexual assault and battery, and constructive discharge together:

> Blevins . . . ratified sexual assault and battery by standing by while a coworker groped Plaintiff and then dismissing [sic] the incident. When a supervisor both engages in and condones harassment, the employer is not insulated. Instead, Defendant Blevins's conduct is imputed to the employer, and the employer is

---

[17] Freightliner does not argue that the SAC does not plausibly allege sexual assault or battery. (*See* Doc. No. 23 at 14 ("Putting aside the issue of whether Defendant Doe's alleged touching of Plaintiff's chest can constitute sexual assault . . . .").)

22

> strictly liable when the harassment results in a tangible employment action, as here, where Plaintiff was forced to resign in constructive discharge.

(Doc. No. 26 at 10.) In any case, the court construes the plaintiff's argument, in his Response brief, to be that, while he has alleged sexual assault against Freightliner under a theory of *respondeat superior*—an argument which he has since abandoned—he has also alleged liability for the assault under a theory of negligent supervision, which Freightliner did not address. As the Tennessee Supreme Court has explained:

> Negligent supervision and *respondeat superior* are distinct legal claims that, if proven, impose liability on an employer in different ways. Under the doctrine of *respondeat superior*, an employer is vicariously liable for the actions of its employees while acting within the course and scope of their employment. In contrast, under a claim of negligent supervision, an employer is directly liable for breaching its own *independent* duty to hire competent employees and supervise them appropriately.

*Binns v. Trader Joe's E., Inc.*, 690 S.W.3d 241, 251 (Tenn. 2024) (quoting *Gordon v. Tractor Supply Co.*, No. M2015-01049-COA-R3-CV, 2016 WL 3349024, at *11-12 (Tenn. Ct. App. June 8, 2016)). But negligent supervision is a standalone claim, which the plaintiff has brought as "Count III." *See Gunter v. Est. of Armstrong*, 600 S.W.3d 916, 929 (Tenn. Ct. App. 2019) ("Under a claim of negligent supervision, an employer is directly liable for breaching its own independent duty to hire competent employees and supervise them appropriately." (quoting *Gordon*, 2016 WL 3349024, at *12)). So even if the plaintiff succeeds on his independent claim against Freightliner for negligent supervision, that does not mean Freightliner is thereby liable for the sexual assault and battery claim brought in Count V.

The plaintiff has not made a substantive response to Freightliner's argument regarding dismissal of his claim of sexual assault and battery. Accordingly, the court will dismiss Count V, for sexual assault and battery, against Freightliner.

23

### 2. Counts IV and VIII

The plaintiff brings claims against Freightliner under both the THRA (Count IV) and Title VII (Count VIII). Count IV specifies only that it alleges a violation of the THRA,[18] while Count VIII specifies that it brings "Discrimination, Retaliation, a Hostile Work and Constructive Discharge Environment [sic]" claims. (SAC at 11, 15.) Freightliner moves to dismiss the "sexual harassment claims" against it "embedded in Counts IV and VIII" of the SAC. (Doc. No. 22 at 1.) While Freightliner notes that "Count VIII" includes "multiple claims under Title VII," it addresses only Claybrook's claim for hostile work environment. (Doc. No. 23 at 2; *see generally id.*) As a preliminary note, therefore, the court will not dismiss the other claims against Freightliner asserted in "Count VIII," independent of its analysis of the hostile work environment claim.

Courts employ the same analysis for hostile work environment claims brought under Title VII and the THRA. *See Austin v. Alexander*, 439 F. Supp. 3d 1019, 1024 n.2. (M.D. Tenn. 2020) (Crenshaw, C.J.) (citing *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008)). The Sixth Circuit has "established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017)). To make out a claim for a sexually discriminatory hostile work environment under Title VII, "a plaintiff must show that: '(1) [he] was a member of a protected class; (2) [he] was subjected to unwelcome . . . harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable.'" *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 683 (6th Cir. 2024) (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724,

---

[18] The allegations within "Count IV" include "discriminatory treatment" and "an objectively hostile and abusive work environment based on his race." (SAC ¶ 74.)

733 (6th Cir. 2006) (omission in *Scholsser*)). Freightliner contends that Claybrook has not plausibly pled the third or fourth elements.

### a) Based on Sex

To prevail on a hostile work environment claim based on sexual harassment, the plaintiff must show that the "harassment complained of was based on sex." *Id.* Harassment is based on sex when an employee is "exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 565 (6th Cir. 2021) (quoting *Oncale*, 523 U.S. at 80). "Title VII's prohibition of discrimination 'because of . . . sex' protects men as well as women." *Oncale*, 523 U.S. at 78 (omission in original). Thus, to prevail on such a claim, a plaintiff must show that, "but for" his sex, he "would not have been harassed in the way that [he] was." *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 565 (6th Cir. 2021) (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999)).

The Sixth Circuit "allows a plaintiff alleging same-sex harassment in hostile work environment cases to establish the inference of discrimination based on sex in three ways: '(1) where the harasser making sexual advances is acting out of sexual desire; (2) where the harasser is motivated by general hostility to the presence of men in the workplace; and (3) where the plaintiff offers 'direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307–08 (6th Cir. 2016) (quoting *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 765 (6th Cir. 2006)). At the motion to dismiss stage, however, a plaintiff need not specify a theory on which he intends to proceed. And a plaintiff "does not need to expressly plead that the harassment was because of his male sex or that the alleged harassers are homosexual." *Halcomb v. Black Mountain Res., LLC*, No. CIV.A. 13-141-DLB, 2015 WL 1757919, at *3 (E.D. Ky. Apr. 17, 2015) (quotation modified).

25

Rather, the plaintiff need only plead facts "sufficient to raise a reasonable inference that he was harassed because he is a male." *Id.*

Freightliner proposes the wrong standard, arguing that Claybrook must "address the 'based on sex' *prima facie* element by alleging one of" the three theories of same-sex harassment. (Doc. No. 31 at 2–3; *see also* Doc. No. 23 at 5 (referring to "Plaintiff's path to satisfying the 'based on sex' *prima facie* requirement").) A "*prima facie* case" is "'an evidentiary standard, not a pleading requirement' and is one that may 'not be transposed into a rigid pleading standard for discrimination cases.'" *Sturgill v. Am. Red Cross*, 114 F.4th 803, 809 (6th Cir. 2024) (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510, 512 (2002)). At the pleading stage, the "plaintiff need only plead 'an adequate factual basis for a Title VII discrimination claim.'" *Mustafa v. Ford Motor Co.*, No. 24-1763, 2025 WL 2720988, at *2 (6th Cir. Sept. 24, 2025) (quoting *Serrano v. Cintas Corp.*, 699 F.3d 884, 897 (6th Cir. 2012)). Claybrook, also without articulating the correct standard, responds that he was subjected to "sexualized groping," that he was "groped because he is a man." (Doc. No. 26 at 3.) Moreover, as the court has noted, Claybrook alleges that Riddle groped him "for the purpose of sexual gratification or to exert control over Plaintiff in the workplace." (SAC ¶ 84.) The court finds that the pleading sufficiently alleges that Claybrook was discriminated against on the basis of sex during the Groping Incident.

At the pleading stage, the plaintiff must satisfy a low bar. And Freightliner's contention that "there is nothing in the SAC to support that the . . . Alleged Touching was motivated by sexual desire" (Doc. No. 23 at 6), is simply not true. The plaintiff alleges that he was groped "for the purpose of sexual gratification." (SAC ¶ 84.) At the pleading stage, that is enough.

        *b)*      *Severe or Pervasive*

Second, Freightliner argues that the alleged sexual harassment was neither severe nor pervasive. (Doc. No. 23 at 8–14; Doc. No. 31 at 4.) To succeed on a hostile work environment

26

claim, the sexual harassment must have been sufficiently "severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Bruce*, 168 F.4th at 377 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). *See also id.* ("[O]ur caselaw is clear that '"severe *or* pervasive" is properly considered in the disjunctive.'" (quoting *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009))). To determine whether alleged conduct was pervasive or severe, the court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Roseman v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, No. 20-2151, 2021 WL 4931959, at *3 (6th Cir. July 14, 2021) (quoting *Harris*, 510 U.S. at 23). Because the SAC alleges sufficient facts from which the court can reasonably infer that the alleged conduct was pervasive, the court does not address whether the alleged conduct was severe.

Because the SAC alleges only two instances of sexual harassment, Freightliner argues that the alleged conduct was not pervasive. (Doc. No. 23 at 9–14.) Claybrook responds that Freightliner incorrectly argues that the sexual harassment alone must be sufficient to state a hostile work environment claim, while in fact the court must consider the totality of circumstances, including the alleged racial harassment. (Doc. No. 26 at 7–9 (citing *Williams*, 187 F.3d at 563–66.) Freightliner does not respond to this argument, other than to state that the plaintiff impermissibly "tried to support the severe/pervasive requirement by including non-sexual harassment allegations." (Doc. No. 31 at 4 & n.1.)

In *Williams*, the Sixth Circuit found that the lower court had improperly "categorized the harassment by the type of harassing action when determining the existence of a hostile environment." 187 F.3d at 361 n.3. The court noted that the district court had impermissibly

"disaggregated" incidents of sexual harassment, "divorcing them from their context and depriving them of their full force." 187 F.3d at 561–62. *Williams*, however, concerned only the disaggregation of categories of *sexual* harassment. But the principle holds in some cases for aggregating sexual and other kinds of harassment to support an argument for pervasiveness, especially where, as here, the plaintiff alleges that they are non-separable. *Accord Wade v. Automation Pers. Servs., Inc.*, No. 1:12-cv-375, 2014 WL 11515694, at *8 n.3 (E.D. Tenn. July 7, 2014) ("*Williams* . . . only deals with one protected characteristic . . . . However, the essence of Wade's argument—that each individual type of harassment should not be considered in isolation— is well taken."), *aff'd*, 612 F. App'x 291 (6th Cir. 2015).

The Sixth Circuit has addressed this issue, noting that "race and sex[] are protected by Title VII," that "[t]hese characteristics do not exist in isolation," and that "Title VII does not permit plaintiffs to fall between two stools when their claim rests on multiple protected grounds." *Shazor v. Pro. Transit Mgmt, Ltd.*, 744 F.3d 948, 958 (6th Cir. 2014) (citing *Hafford v. Seidner*, 183 F.3d 506, 514–15 (6th Cir. 1999) (holding that the plaintiff could rely on evidence of religious harassment to buttress his claim for racial harassment); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416–17 (10th Cir. 1987) (holding that evidence of racial harassment could be considered in a claim for a sexually hostile work environment)). While the plaintiff's argument could have been clearer, his allusion to this line of cases is particularly salient here, where Freightliner does not address the alleged racial harassment in its argument regarding pervasiveness, and where the SAC makes explicit that the alleged multiple forms of harassment were "intertwined." (SAC ¶ 47.) Considering the plaintiff's allegations of harassment in their entirety, including the race-based harassment, the court finds that the alleged harassment was sufficiently severe or pervasive to state a claim for discrimination based on a theory of a sexually hostile work environment. Accordingly,

28

Freightliner's Motion to Dismiss the "sexual harassment" claims in Counts IV and VIII will be denied.

     **B.     Freightliner's Motion to Compel Arbitration**

Claybrook opposes compelled arbitration on four independent grounds, including that, because the SAC alleges sexual assault or sexual harassment, the EFAA prohibits compelled arbitration. (*See generally* Doc. No. 45.) The EFAA provides that, "at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute . . . , no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute." 9 U.S.C. § 402(a). Freightliner concedes that its Motion to Compel "is contingent upon the partial motion to dismiss being granted as the Ending Forced Arbitration Act would otherwise prevent compelling arbitration of the sexual harassment and sexual assault claims." (Doc. No. 37 at 2.)[19] Because the court will deny in part Freightliner's Partial Motion to Dismiss, the court will deny Freightliner's Motion to Compel.

_____

[19] Freightliner "maintains" that, even if the court denies its Partial Motion to Dismiss, the other claims against it are arbitrable, although it "is not currently requesting" relief in this regard. (Doc. No. 37 at 2 n.1.) *Bruce*, which was decided after briefing concluded, forecloses any such request. 168 F.4th at 385–86 ("[W]here a plaintiff brings multiple claims in a single suit against a party with whom she has an otherwise-valid arbitration agreement, and one of those claims alleges a 'sexual assault dispute' or a 'sexual harassment dispute,' the EFAA renders the arbitration agreement unenforceable with respect to each of the claims that comprise her case."). That is, "the EFAA's text renders an arbitration agreement '[un]enforceable with respect to' a plaintiff's entire case, or action, and not only with respect to certain claims therein." *Id.* at 382 (quoting 9 U.S.C. § 402(a)) (alteration in original).

29

## C.     Defendant Japheth Riddle's Partial Motion to Dismiss

### 1.     *Conspiracy to Interfere with Civil Rights*

Claybrook has titled Section I of his Response brief, "plaintiff voluntarily dismisses his § 1985(3) claim against all defendants." (Doc. No. 46 at 1 (capitalization removed).) Claybrook does not cite any source authorizing a plaintiff to dismiss a subset of a complaint's claims, and there is none. Rule 41, "Dismissal of Actions," provides that "the plaintiff may dismiss an action without a court order." Fed. R. Civ. P. 41(a)(1)(A). But "Rule 41(a) allows only for dismissal of *actions*, not claims." *Griesmar v. City of Stow, Ohio*, No. 22-3151, 2022 WL 17581658, at *4 (6th Cir. Dec. 12, 2022) (citing Fed. R. Civ. P. 41(a)). *Accord* 8 Moore's Federal Practice § 41.21 (2026) ("Rule 41(a) may not be employed to dismiss fewer than all of the claims against any particular defendant.").[20] Thus, the plaintiff cannot unilaterally dismiss only Count VI of the SAC. Instead, the court construes the plaintiff's "dismissal" as abandonment, for failure to respond to Riddle's arguments, and the court will dismiss the claim against Riddle.

### 2.     *Intentional Infliction of Emotional Distress*

The elements of an IIED claim under Tennessee law[21] are: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Hux v. Williams*, 751 F. Supp. 3d 885, 899 (E.D. Tenn. 2024) (quoting *Leach v. Taylor*, 124 S.W.3d 87, 92 (Tenn. 2004)).

---

[20] Instead, a "plaintiff wishing to eliminate particular claims or issues from the action should amend the complaint under Rule 15(a) rather than dismiss under Rule 41(a)." Moore's Federal Practice § 41.21 (2026).

[21] While the SAC does not specify that the claim is brought under Tennessee law, Riddle and the plaintiff apply Tennessee law. (*Compare* Doc. No. 43 at 9–12 (applying Tennessee law), *with* Doc. No. 46 at 1–2 (same).)

30

Even construing the SAC as alleging that Riddle groped the plaintiff's chest and said that it felt good, referred to the plaintiff's work area as the "minority corner," and used racial slurs, the plaintiff does not meaningfully respond to Riddle's argument that these actions do not rise to the level of outrageous conduct. (*See* Doc. No. 43 at 9–12.) Instead, the plaintiff states only that the cases upon which Riddle relies do not concern "physical touching" and are therefore not sufficiently analogous to support his argument. (Doc. No. 46 at 2.) As Riddle points out, however, that is not true. (*See* Doc. No. 43 at 2 (citing *Stacy v. MVT Services, LLC*, No. 3:11-cv-01241, 2012 WL 2281495 (M.D. Tenn. 2012) (Bryant, M.J.)).) In *Stacy*, the plaintiff alleged that her colleague "engaged in a pattern and practice of sexual harassment against [her], consisting primarily of verbally threatening and abusive comments, insults, *physical abuse*, intimidation, sexual slurs, derogatory names, and unwelcome suggestive comments." *Stacy*, 2012 WL 2281495, at *1 (emphasis added). The court dismissed the plaintiff's IIED claim under Rule 12(b)(6), finding that the allegations were not, "when compared to other harassment claims, sufficiently heinous to maintain an IIED claim." *Id.* at *8.

"To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement." *Hunt v. S. Baptist Convention*, 777 F. Supp. 3d 776, 832–33 (M.D. Tenn. 2025) (Campbell, C.J.) (quoting *Finley v. Kelly*, 384 F. Supp. 3d 898, 911–12 (M.D. Tenn. 2019) (Crenshaw, C.J.)). "The conduct must be 'atrocious,' 'utterly intolerable,' and 'beyond all bounds of decency.'" *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 903 (M.D. Tenn. 2018) (Crenshaw, C.J.) (quoting *Goldfarb v. Baker*, 547 S.W.2d 567, 569 (Tenn. 1977)). And, in employment cases, viable claims for outrageous conduct are even harder to state than in other contexts. *Cossairt v. Jarrett Builders, Inc.*, 292 F. Supp. 3d 779, 790 (M.D. Tenn. 2018) (Crenshaw, C.J.). Indeed, "Tennessee courts have indicated that trial courts should be wary of permitting IIED claims to move forward

31

in employment discrimination cases, absent exceptional allegations." *DeSoto v. Bd. of Parks & Recreation*, 64 F. Supp. 3d 1070, 1095–96 (M.D. Tenn. 2014) (citing *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003)).

By way of example, this court previously considered the "outrageousness" element in an IIED claim a plaintiff brought against her former supervisor. The plaintiff alleged that her supervisor engaged in "repeated and consistent untoward actions," including that he:

> (1) "leaned his penis into Plaintiff's buttocks area"; (2) blatantly and continually stared at her breasts, instead of looking in her face; (3) inquired into whether she and her husband were "having marital difficulties"; (4) "attempt[ed] to gain control over [her] cell phone in order to check her personal text messages and pictures"; (5) "visit[ed] a restaurant where Plaintiff's minor daughter worked"; (6) follow[ed] Plaintiff around the Hospital; (7) repeatedly ma[de] "inappropriate comments"; and (8) "call[ed] out Plaintiff's name and gyrat[ed] his pelvis at her."

*Strong v. HMA Fentress Cnty. Gen. Hosp., LLC*, 194 F. Supp. 3d 685, 690–91 (M.D. Tenn. 2016) (Sharp, J.). The court noted that, while the question of outrageousness presented "a close[] call," the complaint had stated a claim of IIED. *Id.* The conduct in this case is much less outrageous than the conduct in *Strong* and does not present a close call. The SAC fails to state a colorable IIED claim against Riddle, and the court will therefore grant his motion in its entirety.

### D. Defendant Blevins' Motion to Dismiss

As a preliminary note, the SAC does not make clear, in every instance, which claims the plaintiff brings against which defendant. For example, Counts I–IV do not specify against whom they are brought, and they are very similar to Counts I–IV of the original Complaint, which named only one defendant. (*Compare* Compl. ¶¶ 46–79, *with* SAC ¶¶ *46–79.) Moreover, Counts I–IV invariably refer to a singular defendant. (*See, e.g.*, Count I, SAC ¶ 47 ("Defendant discriminated against Plaintiff[.]"); Count II, SAC ¶ 54 ("Defendant was aware of Plaintiff's protected activity[.]"); Count III, SAC ¶ 65 ("Defendant owed Plaintiff a duty[.]"); Count IV, SAC ¶ 73 ("Defendant was an 'employer' within the meaning of the [THRA.]").) By contrast, the SAC does

32

specify the defendants against whom Counts V–VIII are brought. (Counts V and VII ("All Defendants"), Count VI ("Blevins and Doe"), Count VIII ("Velocity [Freightliner]").) Blevins, therefore, reasonably and conservatively construed the SAC as alleging Counts I–VII against him. (Doc. No. 44 at 1; *see also* Doc. No. 44-1 at 2 (noting that the seven counts are "all *apparently* against Mr. Blevins" (emphasis added)).)

In response, the plaintiff states that some of Blevins' "arguments address claims that Plaintiff does not assert against him." (Doc. No. 47 at 1.) Therefore, "[t]o streamline the issues and promote judicial efficiency," Claybrook "voluntarily dismisses Counts III, IV, V, and VI as to Blevins to ensure accuracy."[22] (*Id.*) The plaintiff does not clarify which claims Blevins mistakenly thinks are stated against him and which the plaintiff purports to dismiss. And, even if the plaintiff were able to dismiss a subset of claims he brought against Blevins, he cannot dismiss claims he never brought but which Blevins mistakenly thinks he did. In any case, for reasons the court has explained, plaintiffs cannot voluntarily "dismiss" some, but not all claims, against defendants. Instead, the court construes Claybrook's nonresponse to Blevins' arguments regarding Counts III, IV, V, and VI as abandonment, and the court will dismiss those claims against Blevins.

That leaves the SAC's two claims brought under Section 1981 (Counts I–II) and the IIED claim (Count VII). The IIED claim against Blevins will be dismissed for the same reasons the same claim will be dismissed against Riddle, without further discussion, as it is based on similar factual allegations, except that Blevins is not even alleged to have touched the plaintiff. The Section 1981 claims require further analysis.

---

[22] Count VI is conspiracy to interfere with civil rights under 42 U.S.C. § 1985(3). (SAC at 13.) The plaintiff states that he "voluntarily dismisses Counts III, IV, V, and VI as to Defendant *Blevins only*." (Doc. No. 47 at 3 (emphasis added).) This statement is inconsistent with the plaintiff's statement, earlier the same day, that he "voluntarily dismisses his § 1985(3) claims against *all defendants*." (Doc. No. 46 at 1 (capitalizations removed).)

33

*1.      Section 1981*

Section 1981 prohibits employment discrimination on the basis of race. It provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The plaintiff brings claims against Blevins under Section 1981 for race discrimination and hostile work environment (Count I) and retaliation and constructive discharge (Count II). Both parties discuss the claims in Counts I and II collectively, and neither party discusses in detail what a plaintiff must allege to survive dismissal. Blevins argues in part that, because the SAC does not allege that he was (a) a supervisor with hiring and firing authority and (b) directly connected to the alleged discriminatory conduct, he cannot be liable under Section 1981. (Doc. No. 44-1 at 3–4 (citations omitted).)[23]

Section 1981 "reaches only purposeful discrimination." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982). So, to state a claim under Section 1981, a "plaintiff must plead . . . that the defendant intended to discriminate against him or her on the basis of race." *Machisa v. Columbus City Bd. of Educ.*, 563 F. App'x 458, 461 (6th Cir. 2014) (citing *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006)). Blevins argues that the plaintiff "does not allege Mr. Blevins's direct connection to any race-based conduct." (Doc. No. 44-1 at 4.) He argues that Claybrook "raises no race-based claims against Mr. Blevins," because Blevins is accused of making the Joke, which was only sexual in nature, and of doing nothing while another coworker

---

[23] The parties dispute whether a supervisor needs to have hiring or firing authority to be liable under § 1981. Finding that dismissal is warranted on other grounds, the court does not reach the question of what level of supervisory authority an employee must have for Section 1981 liability to attach and what a plaintiff must allege in this regard.

34

groped Claybrook. (*Id.* at 3 (citing SAC ¶¶ 22–23).) Neither making a sexual joke, nor doing nothing while the plaintiff was groped, Blevins argues, concerns race.

Indeed, Section 1981 provides relief only for employment discrimination motivated by race. *Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 531–32 (S.D. Ohio 2023); *see also Odom v. Donahoe*, No. 2:13-cv-02354-STA-CGC, 2015 WL 1758131, at *6 (W.D. Tenn. Apr. 17, 2015) ("[F]ederal law is quite clear that Section 1981 prohibits only race discrimination, not sex discrimination." (quoting *Jones v. Continental Corp.*, 789 F.2d 1225, 1231 (6th Cir. 1986))), *aff'd*, No. 15-5633 (6th Cir. Jan. 20, 2016). As the plaintiff briefly notes, Blevins allegedly observed ongoing harassment based on race and did nothing, even when Claybrook brought it to his attention. (Doc. No. 47 at 2.) For example, the plaintiff alleges that his colleagues addressed him by a racial slur and made racist jokes as his expense. (SAC ¶¶ 29–32.) Claybrook "expressed opposition to the remarks and 'jokes' at his expense both to his supervisor and to colleagues." (SAC ¶ 34.) Thus, the plaintiff alleges that he complained of racial harassment to his supervisor, whom he alleges did nothing in response. (*See, e.g.*, SAC ¶ 45 ("This pattern of dehumanizing treatment [was] ignored and implicitly condoned by supervisory staff . . . .").)

The plaintiff's limited response appears to be directed at Blevins' non-responsiveness to his concerns regarding the Groping Incident, rather than the alleged harassment based on race. (Doc. No. 47 at 2.) The plaintiff's only response, on this point, is that "[i]ndividual liability attaches when a supervisor personally participates in or ratifies discriminatory conduct." (Doc. No. 47 at 2.)[24]

---

[24] The plaintiff could have supported his position by citing cases and could have pointed the court to those provisions of the pleading where Blevins is alleged to have engaged in intentional discrimination. He did not. One such case could have been *Wagner v. Merit Distribution*, in which our sister court cited a case from the Eastern District of Pennsylvania, which noted that "individuals are personally involved in the discrimination if they authorized, directed, or

However, the plaintiff has not provided substantive argument on this point. And he alleges only that Blevins participated in the harassment by failing to take appropriate action before the plaintiff resigned. The court cannot find that the plaintiff has alleged Blevins' intentional, direct involvement with racially discriminatory behavior by merely alleging that "supervisory staff" "implicitly condoned" racial harassment. Accordingly, court will dismiss the Section 1981 claims the plaintiff has brought against Blevins in Counts I and II.

## V. CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part Freightliner's Partial Motion to Dismiss, deny Freightliner's Motion to Compel Arbitration, grant Riddle's Partial Motion to Dismiss, and grant Blevins' Motion to Dismiss. As to Freightliner, Count V, for sexual assault and battery, will be dismissed; Counts I–IV and VII–VIII, remain. As to Riddle, Counts VI, for conspiracy to interfere with civil rights, and VII, for IIED, will be dismissed; counts I–V remain. As to Blevins, Counts I–VII will be dismissed; none remain.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge

---

participated in the alleged discriminatory conduct," but further noted that "the failure of a supervisor, who was not otherwise personally involved in the discriminatory act, to 'prevent or remedy harassment is not an affirmative link making the supervisor personally liable.'" 445 F. Supp. 2d 899, 910 (W.D. Tenn. 2006) (quoting *Kohn v. Lemmon Company,* No. Civ. A. No. 97–3675, 1998 WL 67540, at *5, 7 (E.D. Pa. Feb.18, 1998)).

36